# UNITED STATES DISTRICT COURT DISTRICT OF NEVADA

**[DRAFTED WITH AI ASSISTANCE — ALL CITATIONS AND FACTUAL ASSERTIONS INDEPENDENTLY VERIFIED]**

CORIAN EDWARDS,

Plaintiff, v.

BELLAGIO, LLC d/b/a BELLAGIO HOTEL & CASINO,

Defendant.

Case No. 2:25-cv-01247-JAD-MDC

## SECOND AMENDED COMPLAINT

(Drafted in Part Using AI Tools Pursuant to Judge Couvillier's Standing Order)

Plaintiff Corian Edwards ("Plaintiff"), appearing pro se, alleges as follows:

## I. JURISDICTION AND VENUE

1. This action arises under Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section 2000e et seq.; the Americans with Disabilities Act, 42 U.S.C. Section 12101 et seq.; 42 U.S.C. Section 1981; and Nevada common law. Jurisdiction is proper under 28 U.S.C. Sections 1331 and 1343.
2. Venue is proper in this District pursuant to 28 U.S.C. Section 1391(b) because the events giving rise to these claims occurred in Clark County, Nevada.
3. Plaintiff timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission, Charge No. 487-2024-02233. The EEOC issued a Notice of Right to Sue dated April 19, 2025. Plaintiff filed this lawsuit within 90 days of receiving the notice. A true and correct copy is attached as Exhibit A.
4. Plaintiff has exhausted administrative remedies as to all claims asserted herein. To the extent any claim does not require administrative exhaustion (including claims under 42 U.S.C. Section 1981 and the ADA interference claim), Plaintiff asserts those claims independently.

## II. PARTIES

5. Plaintiff Corian Edwards is a resident of Las Vegas, Nevada, and was employed by Defendants as a massage therapist. Plaintiff is an African American male.

6. Defendant Bellagio, LLC d/b/a Bellagio Hotel & Casino ("Bellagio") is a Nevada limited liability company operating the Bellagio Hotel & Casino in Las Vegas, Nevada. Bellagio employed Plaintiff and was Plaintiff's direct employer.

7. Defendant MGM Resorts International ("MGM") is a Delaware corporation headquartered in Las Vegas, Nevada. MGM is the parent company of Bellagio and exercises operational control over employment decisions, human resources systems, security badge access, and hiring across its portfolio of properties, including but not limited to Bellagio, Luxor, the Cosmopolitan, Aria, Mandalay Bay, and Park MGM. Plaintiff's personnel file identifies the Supervisory Organization as "MGMRI (Bill Hornbuckle) >> 190 Spa & Salon - Massage Therapy" (BELL000004). MGM's centralized Workday system processes all employment records, attendance entries, and termination actions. MGM's security badge system controls contractor access across all properties. MGM is liable as a joint employer and/or under agency principles for the acts alleged herein.

## III. STATEMENT OF FACTS

### A. Employment and Workplace Culture

8. On February 20, 2024, Bellagio hired Plaintiff as a Poolside Massage Therapist during the Bellagio pool season in a temporary capacity intended to transition into a permanent spa position based on performance. Plaintiff is a licensed massage therapist with over fifteen years of industry experience.

9. Plaintiff was the only Black male massage therapist in the Poolside Massage Therapy department at Bellagio. He was one of no more than two African American therapists among approximately sixty therapists in the department. He was supervised exclusively by non-Black women.

10. The pool spa culture, as fostered by Lead Therapist Kimberly Magill, prioritized being "fun," which in practice translated to a permissive environment where sexually provocative conversation was normalized, professional boundaries were treated as rigidity, and guest satisfaction was prioritized over employee safety. Plaintiff maintained professional distance in this environment, which management interpreted as a character deficiency rather than appropriate workplace conduct.

11. During the application process, Plaintiff disclosed to MGM that he had a disability. Lead Therapist Magill subsequently became aware that Plaintiff's disability was ADHD. Magill disclosed Plaintiff's ADHD diagnosis to coworker Rebekah Rallis without Plaintiff's knowledge or consent. Rallis used this information to initiate personal contact with Plaintiff by presenting herself as someone who also had ADHD, bypassing the professional boundaries Plaintiff had established.

**B. The Harassment**

12. In early April 2024, coworker Rebekah Rallis, a Caucasian female, began subjecting Plaintiff to unwelcome conduct targeting both his race and sex. Rallis told Plaintiff she was pansexual and "really into Black guys." She repeatedly invited him to her apartment to "trade massages." She followed him during shifts and pulled him away from his assigned work.

13. When Plaintiff declined Rallis's advances and maintained professional distance, Rallis escalated. She began lodging false and retaliatory complaints to management, characterizing Plaintiff as "rude," "overbearing," "unprofessional," and "uncommunicative." These characterizations align with racially coded stereotypes historically ascribed to African American men in the workplace.

14. On or about May 3, 2024, Rallis physically confronted Plaintiff at the poolside computer area, stepping on his foot. Plaintiff reported this incident to Spa Manager Britney Barajas by text message the same day.

**C. Reports to Management and the "Coaching Session"**

15. On April 12, 2024, Plaintiff reported his concerns about Rallis's conduct to Director of Recreation Laura Wood and Lead Therapist Kimberly Magill. Plaintiff requested professional distance from Rallis. Wood's response was to direct Plaintiff to improve his communication with Rallis.

16. On May 2, 2024, at a team meeting that included Plaintiff, Director Wood, Spa Manager Barajas, Lead Therapist Magill, coworker Leydis Brito, and coworker Rebekah Rallis, Plaintiff's alleged "behavior" was discussed publicly before a group of non-Black female employees based on accusations originating from Rallis. The meeting had an itinerary, but the discussion of Plaintiff's behavior was an unwritten addition. Rallis was given the floor to voice her complaints about Plaintiff directly to leadership.

17. Plaintiff warned Rallis twice that she may want to discuss these matters privately. She continued. Left with no alternative, Plaintiff formally reported that Rallis had been sexually harassing him. Director Wood was brought into the meeting. Wood directly asked Rallis whether the statements attributed to her were true. Rallis confirmed that she had made the statements about being "into Black guys" and her sexual identity.

18. Bellagio's EEOC Position Statement characterizes the May 2 meeting as a "coaching session with Director Laura Wood." Bellagio's own Position Statement describes the appropriate process for coaching as "conversations held between the employee's manager and the employee." The May 2 meeting included six people, two of whom were lateral to Plaintiff, and one of whom was his harasser. By labeling this a coaching session, Bellagio admits that its official coaching process included allowing the harasser to confront the complainant and voice her complaints to three levels of management. Bellagio did not merely fail to protect Plaintiff from his harasser. It gave the harasser a formal platform to retaliate within an official management process.

19. Dom Thomas, the only Black male in a supervisory role at the spa, was explicitly excluded from any meeting, room, or private conversation concerning Plaintiff's harassment complaint.

**D. Fabrication of Attendance Records**

20. On April 25, 2024, three Workday attendance entries were created for Plaintiff within 53 seconds of each other — at 10:21:57 AM, 10:22:27 AM, and 10:22:50 AM — by the same manager who also served as the approver (BELL000003). These entries recorded tardiness on April 20 and April 23, and a time-off request for April 25. A correction entry was created the same day at 10:41:27 AM. Defendant has admitted these facts (RFA Nos. 16-17).

21. A "Full Day Absence" entry was created for April 28, 2024, at 7:15:22 AM on April 28. April 28 was a Sunday — Plaintiff's scheduled day off. Defendant has admitted that April 28 was a Sunday (RFA No. 12), that Plaintiff's regular days off were Sunday and Monday (RFA No. 13), and that April 28 was a scheduled day off (RFA No. 14). An employee cannot be absent from a shift that does not exist.

22. None of these attendance entries were discussed with Plaintiff at any time. Defendant has admitted that no coaching was ever provided regarding attendance (RFA No. 21), no written warning was ever issued (RFA No. 22), attendance was not discussed at any meeting prior to termination (RFA No. 23), and attendance was not discussed at the May 10, 2024 termination meeting (RFA No. 24). The Separation PAN does not list attendance as a reason for termination (RFA No. 9).

## E. The Decision to Terminate

23. On May 7, 2024, Director Wood emailed HR Employee Relations Coordinator Chuckia Smith requesting probationary release for both Plaintiff and Rallis (DEF000447). In that same email, Wood wrote: "Additionally, the statement that Rebekah provided today is not in line with what she shared during our meeting last week. During our meeting last week, she confirmed that she said, 'I am into black guys and have dated them in the past.'" Wood, the decision-maker, documented to HR that Rallis had confessed to making the racially and sexually charged statements and that Rallis subsequently changed her account in a written statement.

24. Wood's email to HR identifies the actual reason for Plaintiff's termination: that both employees were creating a "toxic and hostile work environment" and refusing to "communicate and work respectfully with one another." Attendance is not mentioned. The May 4 massage incident is not mentioned. The reason given to HR was the interpersonal conflict between Plaintiff and Rallis — conflict that existed because Plaintiff was being sexually harassed and reported it.

25. On May 8, 2024, Tiffanie Hirschi, Lead Massage Therapist from Park MGM and a close associate of Lead Therapist Magill, sent an email to Wood, Barajas, and Magill regarding observations from May 4, 2024 (DEF000476). This email was volunteered by Wood to HR — it was not requested. Hirschi's email acknowledges that Rallis "seemed to provoke Corian a bit, knowing she could get him fired up." This is Defendant's own witness documenting that the harasser was deliberately provoking Plaintiff.

26. On May 10, 2024, at 11:39:12 AM, Plaintiff's termination was initiated in the Workday system. It was completed at 11:40:41 AM (BELL000003). Director Wood informed Plaintiff that Employee Relations found the situation to be "too much." Plaintiff reported this statement to the EEOC (DEF000177) and to MGM's investigator Pamela de Santiago (DEF000460-461).

27. Plaintiff was terminated on day 79 of his employment — eleven days before the 90-day Culinary Union CBA protections would have required Bellagio to show just cause for termination. By terminating Plaintiff at day 79, Bellagio could invoke "probationary release" and avoid any independent review by a union arbitrator.

28. Defendant gave four different explanations for Plaintiff's termination: (a) Wood told Plaintiff it was "too much"; (b) Wood told HR it was both employees creating a "toxic and hostile work environment" (DEF000447); (c) MGM investigator De Santiago later told Plaintiff it was Wood's decision; and (d) in a Position Statement to the EEOC filed nine months later, in-house counsel Dana Howell claimed for the first time it was "repeated attendance policy violations." Four explanations from four sources. None match. The attendance justification was constructed after the fact to replace a reason that, stated plainly, is retaliation.

## F. The Sham Investigation

29. MGM's internal investigation (Case No. INV-25-02-326) was conducted by Pamela de Santiago and Elisa Travis. The investigation report (DEF000490) documents that Rallis "admitted to making comments that could have been perceived as unprofessional" and that "as a result of this, Rallis was separated from the company." Despite this documented confession and the resulting termination of the harasser, the investigation found Plaintiff's harassment claims "Unsubstantiated." The harasser confessed. She was fired for confessing. And HR labeled the complaint unsubstantiated.

30. The investigation interviews demonstrate unequal treatment of the complainant and the subject. Plaintiff's interview (DEF000457-464) is a garbled, poorly transcribed wall of text with run-on sentences and missing punctuation. Wood's interview (DEF000465-470), conducted by the same investigator seven days later using the same platform, is a clean, professional question-and-answer transcript.

## G. Post-Termination Blacklisting

31. Following termination, De Santiago assured Plaintiff in writing that he could apply to any MGM property other than Bellagio (RFA No. 42, admitted). Plaintiff applied to Luxor Hotel and Casino and was informed he did not meet the requirements, despite having performed the identical role at Bellagio.

32. In or about June 2025, Plaintiff obtained a contractor engagement at the Cosmopolitan through Professional Massage Inc. and received an MGM security badge. That same evening, PMI informed Plaintiff they could no longer work with him. The badge was revoked within hours of Plaintiff's identity entering the MGM security system.

33. MGM Resorts controls 13-14 of the premier spa properties in Las Vegas. Plaintiff has been systematically excluded from employment across this portfolio.

## H. The False Position Statement

34. In February 2025, Bellagio Vice President and Legal Counsel Dana Howell submitted a Position Statement to the EEOC on behalf of Bellagio. That document claimed Plaintiff was terminated for "repeated attendance policy violations" and characterized the May 2 meeting as a "coaching session." Defendant's own RFA responses now prove these claims false: attendance was never coached (RFA No. 21), never warned (RFA No. 22), never discussed at any meeting (RFA Nos. 23-24), and not listed on the separation PAN (RFA No. 9).

35. The Position Statement quoted Rallis's written statement (DEF000475) — the sanitized version — rather than what Wood documented Rallis actually said at the May 2 meeting (DEF000447). Howell presented a false account of the harassment to a federal agency.

## IV. CLAIMS FOR RELIEF

### COUNT ONE — Retaliation (Title VII, 42 U.S.C. Section 2000e-3(a))

36. Plaintiff incorporates paragraphs 1 through 35 as if fully set forth herein.

37. Plaintiff engaged in protected activity when he reported concerns about Rallis to management on April 12, 2024, formally reported sexual harassment on May 2, 2024, and provided a written voluntary statement on May 7, 2024.

38. Defendant retaliated against Plaintiff by terminating him on May 10, 2024 — eight days after his formal report, three days after his written statement, and eleven days before CBA protections would have required just cause.

39. Causal connection is established through: (a) temporal proximity; (b) direct evidence — Wood's "too much" statement linking the complaints to the termination; (c) the complete absence of any documented performance issue predating the harassment report; (d) Wood requesting termination for both the harasser and the complainant in the same email chain; (e) a Position Statement submitted to the EEOC now provably false through Defendant's own discovery; and (f) the strategic timing of the termination to avoid CBA just-cause protections.

40. Defendant acted intentionally, willfully, and with reckless disregard for Plaintiff's federally protected rights.

### COUNT TWO — Race and Sex Discrimination (Title VII and 42 U.S.C. Section 1981)

41. Plaintiff incorporates paragraphs 1 through 40 as if fully set forth herein.

42. Plaintiff is an African American male and a member of protected classes within the meaning of Title VII and 42 U.S.C. Section 1981.

43. Plaintiff was performing his job satisfactorily. He was never coached, warned, or disciplined. His personnel file contains no performance reviews and no corrective action (BELL000007; RFA Nos. 21-24).

44. Plaintiff was subjected to an adverse employment action — termination.

45. Rebekah Rallis, a white female who admitted to making sexually and racially charged comments, was treated as Plaintiff's equal in the termination process. Both received probationary release on the same day. Treating the victim identically to the perpetrator is evidence of discriminatory intent.

46. Rallis's conduct was directed specifically at Plaintiff's race ("I am into Black guys") and sex. The only Black male supervisor — Dom Thomas — was excluded from the meeting addressing Plaintiff's harassment complaint. Plaintiff was the only Black male therapist in his department, supervised exclusively by non-Black women.

47. Defendant's shifting, post-hoc explanations — contradicted by its own RFA admissions — demonstrate pretext.

48. Defendant further interfered with Plaintiff's right to make and enforce contracts under Section 1981 by contributing to post-termination barriers to employment across MGM-affiliated properties.

## COUNT THREE — Hostile Work Environment (Title VII)

49. Plaintiff incorporates paragraphs 1 through 48 as if fully set forth herein.

50. Plaintiff was subjected to unwelcome verbal and physical conduct because of his race and sex, including: Rallis's statements about her sexual attraction to Black men; repeated apartment invitations to "trade massages"; physical trailing during shifts; and a physical confrontation on May 3, 2024 in which Rallis stepped on Plaintiff's foot.

51. The conduct was severe and pervasive. It escalated from verbal to physical over the course of approximately one month and altered Plaintiff's working conditions to the point that he felt compelled to formally report it on two separate occasions.

52. Defendant had actual knowledge. Plaintiff reported to Wood and Magill on April 12, 2024. On May 2, 2024, Rallis admitted the conduct directly to Wood. Wood documented the admission in an email to HR (DEF000447).

53. Defendant failed to take prompt remedial action. Rather than separate the complainant from the harasser, investigate, or take any remedial action, Wood directed them to "work better together." Defendant then terminated the complainant alongside the harasser, found the harassment "unsubstantiated" despite the harasser's own admissions, and submitted a false Position Statement to the EEOC.

54. The hostile environment was further amplified by management's unauthorized disclosure of Plaintiff's ADHD diagnosis to Rallis, who used the information to bypass Plaintiff's professional boundaries. Management subsequently cited the resulting workplace friction as evidence of Plaintiff's poor communication skills, effectively using the symptoms of a medical condition — disclosed without authorization — as a pretext for termination.

## COUNT FOUR — ADA Interference and Confidentiality Violation (42 U.S.C. Sections 12112(d) and 12203)

55. Plaintiff incorporates paragraphs 1 through 54 as if fully set forth herein.

56. Plaintiff disclosed a disability through MGM's formal application process, as required by the ADA's voluntary self-identification provisions. This information was required to be maintained as a confidential medical record under 42 U.S.C. Section 12112(d)(3)(B) and (d)(4).

57. Lead Therapist Kimberly Magill disclosed Plaintiff's ADHD diagnosis to coworker Rebekah Rallis without Plaintiff's knowledge or consent and without any legitimate business justification. Rallis is not a supervisor, manager, first aid personnel, or government official — the only categories of individuals with whom medical information may be shared under the ADA.

58. Rallis used this confidential medical information to initiate personal contact with Plaintiff, presenting herself as someone who also had ADHD. This unauthorized disclosure provided the harasser with a tool to bypass professional boundaries and contributed to the hostile work environment.

59. Defendant interfered with Plaintiff's rights under the ADA by failing to maintain the confidentiality of his medical information and by allowing that information to be weaponized in furtherance of harassment.

**COUNT FIVE — Wrongful Termination (Nevada Public Policy)**

60. Plaintiff incorporates paragraphs 1 through 59 as if fully set forth herein.

61. Nevada public policy prohibits retaliatory discharge and protects employees who report or oppose sexual harassment and discrimination in the workplace.

62. Defendant's conduct — including terminating Plaintiff based on pretextual allegations, fabricating attendance records, submitting a false Position Statement to a federal agency, and interfering with future employment opportunities — violated Nevada's strong public policy.

## V. DAMAGES

Plaintiff seeks:

a. Back Pay — approximately $300,000 b. Front Pay — approximately $750,000 c. Compensatory Damages — approximately $260,000 d. Punitive Damages — approximately $500,000 e. Costs and allowable fees f. Injunctive relief including institutional reform of HR complaint handling procedures across all MGM Resorts International properties g. Any additional relief the Court deems just and proper.

## VI. EXHIBIT

Exhibit A: EEOC Notice of Right to Sue (Charge No. 487-2024-02233)

## VII. JURY DEMAND

Plaintiff demands trial by jury on all issues so triable.

## VIII. CONCLUSION

WHEREFORE, Plaintiff respectfully requests judgment in his favor on all counts and all appropriate legal and equitable relief.

DATED: April _15th__, 2026

Respectfully submitted,

Corian Edwards Pro Se Plaintiff 7233 Majestic Bluff Place Las Vegas, NV 89113 (810) 449-5659 coriandelon@gmail.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of April, 2026, I served a true and correct copy of the foregoing SECOND AMENDED COMPLAINT via the Court's CM/ECF electronic filing system, which will send notification of such filing to all counsel of record:

Paul T. Trimmer, Esq. Chad C. Butterfield, Esq.

Jackson Lewis P.C. 3

00 S. Fourth Street, Suite 900

Las Vegas, Nevada 89101

Paul.Trimmer@jacksonlewis.com

Chad.Butterfield@jacksonlewis.com

/s/ Corian Edwards

Pro Se Plaintiff